
The STATE of Texas, Appellant,

v.

Olivia BOOTH et al., Appellees.

No. 5765.

Court of Civil Appeals of Texas.

El Paso.

Feb. 23, 1966.

Waggoner Carr, Atty. Gen., Sam V. Stone, Jr., T. B. Wright, Hawthorne Phillips, Stanton Stone, Watson C. Arnold and Carroll R. Graham, Asst. Attys. Gen., Austin, for appellant.

Hill D. Hudson, Pecos, for appellees.

CLAYTON, Justice.

This is a condemnation suit brought by the State of Texas against the appellees to condemn approximately 55.30 acres plus an additional 2.70 acres of land for drainage easements out of approximately 9,350 acres owned in fee by defendants, known as the "Booth ranch", and situated in Hudspeth County, Texas, said condemned land to be used in connection with the construction of Interstate Highway 10. On the land condemned was a fence which was removed and laid over on the remaining land and a new fence constructed by appellant and tied into appellees' existing cross-fences. Appellant having filed its petition in condemnation, special commissioners were appointed and after proper notice and hearing an award was entered in the amount of $7,000.00, to which appellant objected and the case was tried before a jury in County Court. Appellant and appellees stipulated that the only questions involved were (1) the fair market value of the property taken on November 29, 1963, and (2) the damages, if any, to the remainder. These were embodied in special issues submitted to the jury as follows:

Special Issue No. 1: The market value of appellees' strip of land condemned on November 29, 1963, considered as severed land, to which the jury found $2,900.00.

Special Issue No. 2: The market value of the remaining land, approximately 9,290 acres, immediately before the strip was

taken, to which the jury answered $185,-000.00

Special Issue No. 3: The market value of the remaining land immediately after the strip was taken, to which the jury answered $175,000.00

Judgment was entered against appellant, in accordance with the verdict, in the amount of $12,900.00. Motion for new trial having been overruled, this appeal was taken.

Appellant presents ten points of error. The first complains of the action of the trial court in refusing to strike the testimony of appellee-landowner Oscar Booth, relative to the damages to the remaining 9,290 acres after the strip was taken for the reason that such testimony was based on improper and non-compensable methods of evaluation and not based on market value as of the day of taking. The witness Booth testified that prior to the time of taking, the strip taken and the remaining land were being operated as a ranching unit and that immediately before November 29, 1963, the day of taking, the "value" of that land per acre as a ranching unit was "approximately twenty dollars". However, he later testified that the land which fronted on the old highway before the construction of Interstate 10, that is, Old Highway 80, was worth per acre $150.00, or $8,700.00 for the strip that was actually taken. No explanation is given in the witness' testimony clarifying this difference in valuation, nor does he justify the $150.00 valuation by any testimony as to "market value". Clearly, there is no probative value to this testimony. Tennessee Gas Transmission Company v. Wood, 331 S.W.2d 808, 810 (Tex.Civ.App., 1960; n. w. h.):

> "* * * We cannot presume that when these witnesses were talking about the 'value' of the land or what it was worth to them, or what they would be willing to pay for it, they were talking about the market value of the land.

The trial court erred in permitting these witnesses to testify as to what the land was worth, or what its 'value' was, without a clear showing that they were testifying concerning the 'market value' of the land."

See also Dallas Railway & Terminal Company v. Gossett, 156 Tex. 252, 294 S.W.2d 377, 380 (1956):

> "It is well settled that the naked and unsupported opinion or conclusion of a witness does not constitute evidence of probative force and will not support a jury finding even when admitted without objection."

The following further answers were elicited from the witness by appellees' attorney:

> "Q I believe we figured it (the strip taken) fifty-eight acres roughly. There would be then at least nine thousand two hundred and eighty five acres out of that that wasn't taken by the State?
>
> A Yes, sir.
>
> Q Is that correct?
>
> A Yes, sir.
>
> Q And you place the value on that immediately prior to this condemnation on November 29th, 1963, at twenty dollars per acre, is that correct?
>
> A Yes, sir.
>
> Q All right sir. I figure then the total value of the owned property within the ranching unit and operated as such prior to that time was a hundred and eighty-five thousand six hundred dollars. Is that approximately correct?
>
> A Yes, sir.
>
> Q Now, Mr. Booth, considering what you would have to spend to get that watering replaced how much less than that, how much would be deducted from that for that rea-

son? What was that figure you gave me awhile ago?

A Seven thousand nine-fourten-ninety-eight.

Q Seven thousand-nine-fourteen-ninety-eight. Well, lets call it seven thousand-nine hundred and fourteen dollars. Is that satisfactory to you?

A Yes, sir.

Q And how much did you say that your land now, not the T & P Land but your land as a whole has depreciated in value by reason of the, of your failure, on account of this situation to be able to run sheep on there?

A Approximately twenty-two percent plus.

Q Then the value has decreased, the hundred and eighty-five thousand six hundred has decreased twenty-two percent, in your opinion, of the hundred and eighty-five thousand-six hundred?

A Yes, sir, about twenty-two and a half percent.

Q Twenty-two and a half percent. Can you multiple that out and give me the actual figures on it?

A I have forty-two thousand and sixty-six dollars but that was including the fifty-five acres that the Highway Department has taken.

Q I see. Well exclusive of that lets figure it, Mr. Booth. Figure a hundred and eighty-five thousand at six hundred—Mathematically I am very poor.

A I figure forty-one thousand-seven-sixty, if I haven't made an error.

Q Forty-one-seven-sixty? Forty-one thousand seven hundred and sixty dollars?

A Yes, sir.

Q All right, sir. And then you have got seven thousand nine hundred and fourteen to be added to that. Am I correct?

A Yes, sir.

Q You figure then a total decrease in value before the condemnation and afterwards as forty-nine thousand six-hundred and seventy-four, is that figure correct?

A Yes, sir.

Q Now, Mr. Booth, allowing and being as conservative as you can and placing your actual value, I mean your actual depreciation, in your opinion, as low as it could possibly be, what would you say was the difference between the value of the tracts of land in that ranch that you own that were not taken by the State by condemnation but *by* cause of it between, before November 29th, 1963, and after the condemnation?

A A little over sixty thousand dollars.

Q All right, sir. Now, —

MR. CURTIS: I don't think he understood you.

MR. HUDSON: I don't think he did either.

MR. HUDSON:

Q Mr. Booth, I am not figuring the land that they took. You had a difference in the twenty-two percent deduction figure of forty-one-thousand seven hundred and sixty?

A It would be forty-nine thousand-six-seventy-four.

Q All right. Now what do you figure, just being absolutely conservative what do you know to be the damage in your opinion?

A Around forty thousand.

Q Around forty thousand dollars?

A Yes, sir.

Q All right, sir. Mr. Booth, you have been deprived of access to all of the land which you own in Section 12 and 16 which previously fronted on Highway 80, have you not?

A Yes, sir.

Q From the south side?

A Yes, sir.

Q And there were a total of fifty-eight, whatever that point was, acres of land taken by the State. What do you estimate the value of that land that fronted on Old Highway 80 to have been worth per acre?

A A hundred and fifty dollars. It would be a total of—

Q I am just figuring fifty-eight acres for this purpose. If it is fifty-eight acres at a hundred and fifty dollars, it would be eighty-seven hundred dollars for that tract that they have actually taken, is that correct?

A Yes, sir."

It was at that point, after completion of Mr. Booth's direct testimony, that appellant made its motion to strike the testimony of the witness, which motion was overruled by the court. Appellant's position, as expressed in its motion to strike, finds support in the Commission of Appeals adopted opinion in State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194 at pages 200 and 201:

"Generally, it may be said that it is proper as touching the matter of the value and depreciation in value to admit evidence upon all such matters as suitability and adaptability, surroundings, conditions before and after, and all circumstances which tend to increase or diminish the present market value. Evidence should be excluded relating to remote, speculative, and conjectural uses, as well as injuries, which are not reflected in the present market value of the property.

\* \* \* \* \* \*

"As indicated above, the correct method of adducing evidence as to market value is by witnesses, after suitable qualification, giving their opinion as to the market value of the residue before and after the taking, rather than undertaking to testify to specific items of injury and · damage."

As stated, the motion to strike was overruled by the court. We feel that in this the court was in error, since the testimony offered dealt with specific items of injury and damage, rather than being an opinion as to the market value of the residue of land before and after the taking. On this ground, we sustain appellant's first point of error.

Appellant's second and third points of error assert that there was no evidence, and insufficient evidence, that there was any diminution in the market value of the remainder of the land immediately after the taking of the land condemned, and points of error numbers four and five assert that the court erred in not granting appellant's motion for a new trial because of no evidence, and insufficient evidence to support the jury's findings and answers to special issue number three, and that such answer was against the great weight and preponderance of the evidence and is manifestly unjust.

Another witness for appellees, Mr. Kermit Holmes, testified on voir dire that he was not a real estate broker nor an expert on the value of real estate in the vicinity of appellees' ranch; that he made one purchase of 0.9 of an acre in the vicinity because the property was on Interstate 10. Over objection, the witness was allowed to testify that he paid a thousand dollars for the 0.9 of an acre. Another witness, Mr. Ed Love, had lived and ranched in the particular area of the country and

was familiar with the Booth ranch and, while not a real estate man, was, to the best of his ability, familiar with the value of ranch land in that area and testified that the value of such land immediately prior to November 29th, 1963 was around twenty dollars per acre, and that at such time land which fronted on Old Highway 80 had a minimum value of $100.00 per acre. The witness further testified that land such as the Booth ranch, with proper fencing, could run sheep but would be unable to do so where the fence planned by the Highway Department immediately prior to taking, in drainage areas, had the lowest wire twelve inches above the ground, and that this consideration would decrease the value of such land as a ranching unit. The witness was familiar with the washing and filling of earth tanks in the general area and with the flow of water in heavy rains specifically in the area of appellees' tank, and had examined the drainage provided under the new Interstate 10 in that area, and stated that such drainage in his opinion would increase the wash of sediment into the tank and eventually destroy its use for watering.

A further witness for appellees was Mr. William Wyche, a ranch owner in the area until he sold out in 1963. His ranch was about five or six miles from the Booth ranch and somewhat comparable thereto. The Wyche property sold for twenty-two dollars per acre. Mr. Wyche testified that an earth tank would fill up on an average of five or six years. The appellee-witness Booth had testified that he had used his earth tank since, he believed, 1947.

Mr. Kenneth Wheeler, a witness for the State, was a civil engineer who had been a real estate appraiser for about six years, who had studied in the American Institute of Real Estate Appraising, held a real estate broker's license and was a member of the Texas and National as well as the local (El Paso) Real Estate Boards. He had appraised property for authorities exercising the right of eminent domain as well as for owners whose property was being condemned, including over a hundred ranches, twelve of which were in Hudspeth County. He was employed by the Texas Highway Department to make an appraisal of the Booth ranch and had driven or walked over it about a half dozen times, alone or accompanied by Mr. Booth. After giving an explanation of the term "market value" the witness then went into the three approaches to market value—the "cost approach, the market approach, and the income approach". The witness then testified to several confirmed comparable sales. The first was on the basis of $11.00 per acre, including improvements, in 1963. The next, also in 1963, was the Wyche sale, on the basis of $23.36 per acre, including improvements. The third was in 1961 on the basis of $9.75 including improvements. A fourth, no year date given, was based on $12.80 per acre, including improvements, and a fifth, in 1963, at $13.25, including improvements. The witness then testified to market values of the Booth ranch. Of the part taken, including fee and easement, he stated the market value to be $905.00. As to the market value of the remaining land, excluding the part taken, and before it was taken, he stated to be $204,095.00 as of the date of taking, November 29, 1963. He placed the same value on the remaining land after the taking, but excluding the land taken. He broke this figure down to $150,000.00 for the land alone and $55,000.00 for improvements. He also gave the estimated market value of the land remaining and the part taken in fee as $16.00 per acre, plus improvements, and for the easement land $8.00 per acre. He did not consider the sale of the 0.9 acre to Mr. Kermit Holmes as comparable to the 55 acres in fee taken from the Booth ranch.

We consider the above to be a fair condensation of the pertinent testimony in the instant case relative to market value of the Booth ranch. While that testimony is to some extent related to

specific items of injury and damage, we consider that there was some evidence, but insufficient evidence, to show a diminution of the market value of the remainder of the land immediately after the taking of the land condemned, and that the jury's answer to special issue number three was against the weight and preponderance of the evidence. We therefore sustain appellant's points of error numbers three and five, but overrule points two and four, "no evidence" points. We also sustain appellant's point of error number seven, that there was insufficient evidence to support the jury's finding in special issue number one, relative to the market value of the strip of land taken, considered as severed land, but overrule point of error number six, which is a no evidence point. Under this state of findings, we deem it unnecessary for us to pass upon point of error number eight, complaining of the trial court's admission of the witness Kermit Holmes' testimony as to the sale of the 0.9 acres of land as not being a comparable sale. Point of error number nine relates to a claimed excessiveness of the trial court's judgment and demands a remittitur of $11,508.00, but we feel that a new trial should be granted without requiring a remittitur, as set out in point of error number ten alleging that the cumulative effect of the alleged errors amounted to a denial of appellant's rights and was reasonably calculated to cause and probably did cause the rendition of an improper and excessive verdict and judgment. Scott v. McLennan County, 306 S.W.2d 943, 948 (Tex.Civ.App., 1957; ref., n. r. e.):

"Bearing in mind the errors here pointed out, and bearing in mind that the sole question before the jury was the reasonable cash market value of the property at the time it was being condemned, we feel that we must take into account the cumulative effect of the errors here pointed out, and that such errors, when considered together under all the facts and surrounding circum-stances, constitute reversible error. As we understand our Supreme Court in Southern Pacific Co. v. Hubbard, [156 Tex. 525], 297 S.W.2d 120, point 1 on page 125, the court may consider the cumulative effect of the errors it finds in a cause. We do not mean to hold that the errors pointed out, standing alone, are insufficient to reverse this cause. We are holding that the cumulative effect of all the errors, under all the facts and surrounding circumstances, does constitute reversible error. We are of the further view that the errors complained of and here discussed amounted to such a denial of the rights of appellant as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment in this case. See Rules 434 and 503, Texas Rules of Civil Procedure."

Appellant's point of error number nine is overruled, but point of error ten is sustained and the judgment of the trial court is reversed and the cause remanded for a new trial.